**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel.** | ) | |
| **RAY FERGERSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 09 C 2105** |
| | ) | |
| **MIKE ATCHISON, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

An Illinois jury convicted Ray Fergerson of first-degree murder. The trial judge sentenced him to a prison term of life without parole. Fergerson has petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2254. He contends that the prosecution withheld material exculpatory evidence from him and used perjured testimony and that his trial and appellate counsel rendered ineffective assistance. For the reasons stated below, the Court denies Fergerson's petition and declines to issue a certificate of appealability.

**Background**

**A.     Murder and trial**

Willie Bibbs was murdered on June 14, 1981 on 43rd Street in Chicago. In October 1981, police arrested Earl Hawkins for the murder. Hawkins was a member of the El Rukn gang and had been identified as present at the scene. Hawkins was tried, and a jury acquitted him in 1982.

Prosecutors later charged Hawkins and a fellow gang member in an unrelated double homicide. They were tried in a bench trial before Circuit Court Judge Thomas Maloney. Before trial, Hawkins's lawyer arranged to pay Maloney $10,000 to ensure a not guilty verdict. *See People v. Hawkins*, 181 Ill. 2d 41, 47, 690 N.E.2d 999, 1001 (1998). The lawyer delivered $10,000 in cash to Maloney on the first day of the trial. Maloney, however, was concerned about an ongoing FBI investigation into bribery in the Chicago courts, so he returned the money. Maloney then found both defendants guilty. After a jury found no mitigating circumstances, Maloney sentenced Hawkins to death on September 19, 1986. *Id.* at 45, 690 N.E.2d at 1001.

Chicago Police Detective Daniel Brannigan observed some of Hawkins's trial. Brannigan was working with the federal Bureau of Alcohol, Tobacco, and Firearms (ATF) to investigate the El Rukns. As part of that work, he observed Hawkins's trial because the FBI suspected that Hawkins or his codefendant might attempt to bribe Maloney. After the conclusion of the trial, Hawkins contacted Brannigan while his appeal was still pending. He offered to help Brannigan in exchange for getting help himself. Brannigan met with Hawkins. Brannigan later stated that he refused to make any promises to Hawkins but told Hawkins that any cooperation would be presented to the prosecutors.

In 1988, Fergerson and other members of the El Rukn gang were tried for the Bibbs murder. Hawkins testified against them as a witness for the prosecution. He stated that Jeff Fort, the leader of the El Rukns, held a meeting at which he ordered gang members to shoot up 43rd Street and a bar located there as part of a dispute with another gang. Hawkins acted as a lookout to tell the shooters that the coast was clear

2

and to watch for police. According to Hawkins, Fergerson was one of the three shooters and was to use a machine gun. At the scene, Hawkins stood on 43rd Street while the three shooters made their way down an alley to the street carrying guns and wearing ski masks. Hawkins saw one of the shooters, whom he identified as Derrick Kees, peek around the corner of the alley twice and then fire five or six shots at Bibbs. The shooters then ran back down the alley.

At trial, Hawkins testified that he had been sentenced to death for murder and that his appeal in that case was before the Illinois Supreme Court. He acknowledged that his testimony as a prosecution witness in the Bibbs case could be advantageous to him should the Supreme Court reverse his death sentence. Hawkins also revealed that he had been charged in another double homicide that prosecutors had chosen not to prosecute, likely because of his cooperation. Defense counsel also showed that Hawkins had lied about his role in the Bibbs murder when he was tried for the murder. Hawkins admitted that he had continued to lie about the Bibbs murder after his acquittal for the murder until he was sentenced to death for the double homicide and presumably needed help from the police. Hawkins admitted that he wanted to benefit from his testimony but said that the government had not promised him anything. The jury did not hear any evidence related to Hawkins's bribe of Maloney, because Fergerson and the other defendants were unaware of it and received any information about it from the prosecution.

Several witnesses corroborated parts of Hawkins's testimony. Two witnesses to the shooting identified Hawkins as a person who had been pacing back and forth on 43rd Street and nodded into the alley immediately prior to the shooting. They also

stated that they had seen someone shoot Bibbs from the alley, but they were unable to identify any of the shooters.  Two other former members of the El Rukn gang testified as well.  Trammel Davis stated that he had seen Fergerson and other defendants at a meeting with Fort on the day of Bibbs's murder and that Fergerson had held a machine gun.  Anthony Sumner testified that he drove the shooters to the scene while another gang member drove the guns separately.  He saw Fergerson get the machine gun out of the trunk of the other car and go down the alley with the other two shooters.  Sumner stated that he saw the shooters peer out of the alley twice and heard gun shots.  The shooters then ran back to his car, and he drove them away.

The jury convicted Fergerson on November 18, 1988.

## B.    Appeal and post-conviction proceedings

After Fergerson's conviction, he appealed to the Illinois Appellate Court along with his codefendants.  The court affirmed the conviction on June 4, 1993.  *People v. Fort*, 248 Ill. App. 3d 301, 320, 618 N.E.2d 445, 459 (1993).  It is unclear whether Fergerson filed a petition for leave to appeal (PLA) with the Illinois Supreme Court.  Respondent states that he has confirmed with the Supreme Court that Fergerson did not file a PLA separate from his codefendants, but Fergerson has produced a letter from his public defender stating that the Supreme Court denied his PLA on October 6, 1993.  Pet.'s Resp. to Mot. to Dismiss at 70.  At any rate, Fergerson states that he does not challenge any decision of the Illinois courts on direct appeal.

In October 1989, Hawkins pled guilty to federal criminal charges as part of plea agreement under which he also promised to cooperate with federal and state authorities.  In 1991, a federal grand jury indicted Maloney for several bribery-related

4

offenses.  Hawkins, who was still under an Illinois sentence of death, agreed to testify as a witness against Maloney.  A federal jury convicted Maloney on April 16, 1993.  *See United States v. Maloney*, 71 F.3d 645, 652 (7th Cir. 1995).

After Maloney was convicted, Hawkins initiated a post-conviction proceeding in state court seeking to have his murder conviction vacated.  On January 29, 1998, despite several equitable arguments by the prosecution that Hawkins was not entitled to a new trial, the Illinois Supreme Court vacated Hawkins's conviction and ordered a new trial.  *Hawkins*, 181 Ill. 2d at 64, 690 N.E.2d at 1009.  Prosecutors initially sought the death penalty against Hawkins in his second trial.  After losing an interlocutory appeal in the Illinois Appellate Court involving an evidentiary issue related to Hawkins's codefendant, but winning the issues that affected Hawkins, prosecutors reached a plea agreement with Hawkins in exchange for his testimony against his codefendant.  *See People v. Hawkins*, 326 Ill. App. 3d 992, 762 N.E.2d 46 (2001).  Hawkins pled guilty in exchange for a sentence that gave him the possibility of parole when he turns seventy-two.

In early February 1998, Fergerson received a letter from his former public defender telling him that Hawkins's conviction had been vacated.  The public defender attached a newspaper article about Hawkins's case.  He suggested that Fergerson seek post-conviction relief on the basis that prosecutors had not disclosed to him at the time of his trial that Hawkins had tried to bribe a judge and was likely to have his conviction overturned.

Fergerson filed a *pro se* petition for post-conviction relief in state court on March

25, 1998.  His only claim was that the prosecution had suppressed material impeachment evidence in violation of his due process rights.  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The trial court dismissed the petition as frivolous on June 23, 1998.  Fergerson appealed with the assistance of counsel, and the Illinois Appellate Court reversed in 2001.

On remand, the state trial court held an evidentiary hearing on Fergerson's claims.  Fergerson, with the assistance of counsel, presented two claims:  the prosecution had violated *Brady* by failing to disclose that it knew that Hawkins had attempted to bribe Maloney and had knowingly allowed Hawkins to give perjured testimony when he said he had no deal to cooperate with the authorities.  The trial court denied the petition after finding that Fergerson had not shown that prosecutors withheld any significant evidence or that Hawkins had a deal or understanding with the prosecution at the time of the trial.  Fergerson appealed, raising the same two issues and contending that his post-conviction counsel had been ineffective in failing to call Hawkins to testify.  The Illinois Appellate Court affirmed on April 18, 2008.  Fergerson filed a PLA with the Illinois Supreme Court raising the same three issues.  The court denied his PLA on September 24, 2008.

Fergerson filed a *pro se* successive post-conviction petition in state court, and the trial court denied it on March 6, 2009.  Fergerson appealed, but his brief challenged only the costs and fees imposed by the trial court.  The Illinois Appellate Court affirmed on November 24, 2010.  Fergerson filed a PLA with the Illinois Supreme Court challenging the fees, and the court denied his PLA on May 25, 2011.

**Discussion**

In his habeas petition, Fergerson asserted four claims: the prosecution suppressed material impeachment evidence related to Hawkins bribe of Maloney; the prosecution knowingly allowed Hawkins to give perjured testimony; and he received ineffective assistance of trial and appellate counsel because counsel failed to investigate and determine that Hawkins had bribed Maloney and was committing perjury. In his response to respondent's motion to dismiss, Fergerson appeared to assert that his trial counsel was also ineffective for failing to call six eyewitnesses. On February 12, 2012, the Court determined that any such claim based on actions that Fergerson was aware of at the time of his trial would be untimely. *See* 28 U.S.C. § 2244(d)(1). In his reply in support of his habeas petition, Fergerson also appears to assert that his post-conviction counsel in state court provided ineffective assistance in several ways. Ineffectiveness of post-conviction counsel, however, is not a ground for relief under section 2254. *Id.* § 2254(I).

Respondent contends that Fergerson's perjury and ineffective assistance of trial and appellate counsel claims are procedurally defaulted. Respondent also contends that all of the claims fail on the merits.

**A.     Procedural default**

"To obtain federal habeas review, a state prisoner must first submit his claims through one full round of state-court review." *Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009). The petitioner "must have fairly presented the substance of [his] claims to the state courts by articulating both the operative facts and applicable law that [he]

7

claims entitle [him] to relief." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Gonzales v. Mize*, 565 F.3d 373, 380 (7th Cir. 2009) (internal quotation marks omitted). When a claim is procedurally defaulted, it cannot be reviewed in federal court "unless the petitioner can demonstrate both cause for and prejudice from the default or that a miscarriage of justice will occur if [the Court does] not consider his claims." *See Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009).

Fergerson never presented claims of ineffective assistance of trial or appellate counsel to the state courts at any level, much less through one full round of state-court review. In his direct appeal, Fergerson did not raise any issues related to ineffectiveness of his trial counsel. *Fort*, 248 Ill. App. 3d 305–06, 618 N.E.2d 445, 459–50. In his initial post-conviction petition and the resulting evidentiary hearing, Fergerson raised only his *Brady* and perjury claims, and he added a claim of ineffectiveness of *post-conviction* counsel when appealing denial of that petition. In his second post-conviction petition, Fergerson again did not claim that his trial and appellate counsel had been ineffective. On appeal from denial of that petition, he argued only that the trial court's decision to impose costs on him should be overturned.

Fergerson contends that he can show cause for failure to present his ineffective assistance claims to the state courts. "Cause for a default is ordinarily established by showing that some type of external impediment prevented the petitioner from presenting his claim." *Promotor v. Pollard*, 628 F.3d 878, 887 (7th Cir. 2010) (internal

quotation marks omitted).  Fergerson appears to contend that he did not discover certain evidence demonstrating Hawkins's perjury—in particular, Hawkins's plea agreement with the federal government and his federal grand jury testimony—until it was too late to present his ineffectiveness claims to the state courts.  Both Hawkins's plea agreement and his grand jury testimony, however, were available and known to Fergerson in time for his post-conviction counsel to submit them as evidence before the 2005 evidentiary hearing in state court, and he did so.  Resp. Ex. M at 88, 123. Because Fergerson was able to use these documents to support his argument that Hawkins had committed perjury at his trial, there is no good reason why he could not have used the documents to contend and argue at the same time that his trial and appellate counsel were ineffective.

Fergerson also cites the case of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), in which the Supreme Court stated that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 1315.  The Court based its decision on the fact that in Arizona, the state where the petitioner had been convicted, defendants cannot raise claims of ineffective assistance of trial counsel until collateral, post-conviction proceedings. *Id.* at 1316–19.  The Court need not consider whether *Martinez* would apply to an Illinois prisoner's federal habeas corpus petition, because Fergerson has not argued that his post-conviction counsel was ineffective for failing to raise ineffectiveness of trial and appellate counsel or that such ineffectiveness is cause to excuse his default.  Fergerson argues that his post-conviction counsel was ineffective because he failed to call Hawkins at the evidentiary hearing, failed to ask the trial judge

9

to recuse himself, failed to call the trial judge as a witness, and failed to present documentary evidence of Hawkins's perjury. All of these contentions, however, appear to be arguments in favor of granting his habeas petition. Fergerson does not offer them to excuse his failure to present his trial and appellate ineffective assistance claims to the state courts.

Fergerson also contends that the Court should consider his defaulted claims because failure to consider them "would result in a fundamental miscarriage of justice, namely, in a conviction of one who is actually innocent." *Woods*, 589 F.3d at 373 (internal quotation marks omitted). A petitioner asserting actual innocence, however, "must *demonstrate* his innocence. Indeed, he comes before the habeas court with a strong—and in the vast majority of the cases conclusive—presumption of guilt." *Id.* at 377 (emphasis in original; internal quotation marks, brackets, and citation omitted). "To rebut this presumption, [he] must make a credible claim, supported by new, reliable evidence of his innocence. He must establish that in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* (citation and internal quotation marks omitted).

Fergerson's new evidence does not demonstrate that no reasonable jury would have voted to find him guilty beyond a reasonable doubt. His new evidence further impeaches Hawkins by showing that he bribed a judge. The new evidence also suggests that Hawkins may have perjured himself when he talked about being under a death sentence and agreed with the prosecutor's statement that he could not be executed twice, on the theory that Hawkins knew he was likely to have his conviction and death sentence reversed because of Maloney's bias. Trial Tr. at 4131, 4274. This

evidence certainly reflects that Hawkins had a motive to lie and had a history of corrupting the judicial process. Hawkins had already been significantly impeached at Fergerson's trial, however. The evidence at trial showed that Hawkins had lied about his role in the Bibbs murder for several years, until, after a death sentence was imposed, he decided that it was in his interest to cooperate with police. The evidence at trial also showed that Hawkins had been implicated in two different double homicides and spent time in prison for another killing he had committed in his teens. *Id.* at 4198–4200, 4217–18, 4224–25. Any reasonable juror would have understood that Hawkins had a motive to help the prosecution in Fergerson's case.

Nothing about the new impeachment evidence against Hawkins demonstrates that no reasonable juror would have chosen to believe his story that Fergerson was one of the three intended shooters the night of the Bibbs murder and that he had carried a machine gun. *Id.* at 4104, 4116–17. Hawkins's testimony about the shooting was supported by that of Sumner, who also said that Fort had ordered Fergerson to take a machine gun and shoot up 43rd Street and that Fergerson had walked down the alley with the other two shooters and carried a machine gun. *Id.* at 4515, 4517–18, 4526–28. In light of this evidence, even if Fergerson's new evidence had further impeached Hawkins, there is no basis to say that no reasonable juror would have voted to find Fergerson guilty.

In sum, the Court concludes that Fergerson's ineffective assistance of trial and appellate counsel claims are procedurally defaulted and that the default is not excused under the actual innocence exception.

Respondent also contends that Fergerson's perjury claim is procedurally

defaulted.  Respondent concedes that Fergerson presented this claim to the state trial court in his post-conviction petition.  Fergerson contended that Hawkins had a deal or expectation of a deal with federal and state authorities at the time of Fergerson's trial and that "[t]he State knowingly misled the jury by adamantly stating that there was no deal, thus violating Fergerson's due process rights."  Resp. Ex. M at 46.

Respondent contends, however, that this perjury claim was not presented in Fergerson's appeal from denial of his post-conviction petition or his PLA.  The Court disagrees.  The facts Fergerson cited in his appeal briefs leave no doubt that he was contending that the prosecution knowingly allowed Hawkins to give perjured testimony.  Fergerson's appeal brief noted that Hawkins testified that he had not asked Brannigan for any help in getting off death row, and Fergerson's PLA stated that Hawkins testified that he had received no promises about what might happen if he won his appeal.  Resp. Ex. P at 6, Resp. Ex. T at 6.  The briefs then alleged that Hawkins was already receiving benefits from his testimony, including that he had been placed in federal custody instead of state custody and that Brannigan had told him that his cooperation would be presented to state and federal prosecutors.  Resp. Ex. P at 17–18; Resp. Ex. T 14–15.  Fergerson's briefs therefore make it clear that he was, in fact, asserting a claim that the prosecution allowed Hawkins to give perjured testimony.  Accordingly, Fergerson fairly presented his perjury claim at levels of the state post-conviction process.  This claim is not procedurally defaulted.

## B.    Merits of the *Brady* claim

A person convicted in state court may obtain a writ of habeas corpus on a claim that was adjudicated on its merits in state court only if the state court's adjudication of

the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2); *Griffin v. Pierce*, 622 F.3d 831, 841 (7th Cir. 2010).  In considering a claim in a habeas corpus petition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

"A state court's decision is contrary to clearly established federal law if the state court applies a rule different from the governing law set forth in Supreme Court cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts."  *Woods,* 589 F.3d at 377 (brackets and internal quotation marks omitted).  A decision "is an unreasonable application of clearly established federal law if it correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case."  *Id.* at 378 (internal quotation marks omitted).  The petitioner must show that the state court's decision "was so erroneous as to be objectively unreasonable."  *Id.* (internal quotation marks omitted). Finally, a state court decision is considered to be based on an unreasonable determination of the facts in light of the evidence presented if the petitioner is able to rebut, by clear and convincing evidence, the presumption of correctness that applies to state court fact-finding.  *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

fairminded jurists could disagree on the correctness of the state court's decision."

*Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (internal quotation marks omitted).

Fergerson contends that the prosecution suppressed impeachment evidence in violation of his due process rights. In particular, he contends that the prosecution concealed evidence that Hawkins had bribed Maloney and had a deal or understanding with federal and state officials to testify in exchange for their assistance with his death penalty case.

> A *Brady* violation can be broken down into three basic elements: (1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, materiality. Evidence is suppressed when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence.

*Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008) (citations and internal quotation marks omitted).

The state appellate court adopted the reasoning and factual findings of the state trial court in denying Fergerson's *Brady* claim. Resp. Ex. S at 5–7. The trial court reasoned that any claim that the prosecution had suppressed evidence failed because the prosecution had not possessed the information and evidence that Fergerson claimed it failed to disclose. Specifically, the state trial court found that at the time of Fergerson's trial, Brannigan was not aware of Hawkins's bribery of Maloney, and the prosecution had not agreed to and did not know of any deal or benefits given or promised to Hawkins. Resp. Ex. S at 5–7.

The trial court based its decision on Brannigan's testimony at the evidentiary

14

hearing that he had not been aware of the bribe. The court found that this testimony was not contradicted by statements Brannigan had given before Fergerson's trial. Resp. Ex. O at 5–7. The court also found that there was no evidence that Hawkins actually had a deal or understanding with the government at the time of the trial. It credited Brannigan's testimony at the evidentiary hearing that he had made no promises to Hawkins and noted that the Illinois prosecutors defended Hawkins's death sentence even after his bribe of Maloney was revealed and began to retry Hawkins after the Illinois Supreme Court overturned the initial conviction. The Court concludes, for the described below, that Fergerson has not shown by clear and convincing evidence that the state court's factual findings are incorrect.

At the evidentiary hearing, Brannigan stated that at the time of Fergerson's trial, he knew there had been an attempt to bribe Maloney during Hawkins's trial, but he did not know whether the attempt had been successful. Resp. Ex. DD(26) at 192–93. Brannigan stated that the FBI's investigation of Maloney was entirely separate from his work on the El Rukn gang and that even the federal agents with whom he worked did not know anything about a potential bribe. *Id.* at 198–99. Brannigan stated that he had no access to information or reports from the FBI's investigation. *Id.* at 200. Brannigan admitted that he was asked to observe Hawkins's trial before Maloney because the FBI believed a bribe might be attempted. He said, however, that he had observed the trial for only one or two days because it would look natural for an investigator connected to the El Rukns to observe the trial for that amount of time. Brannigan stated that at the time, he had no idea whether a bribe had occurred and knew no specifics. *Id.* at 202–03. 216–17. The state trial court found Brannigan's statements credible.

Fergerson contends that at a pretrial hearing, Brannigan gave contradictory answers regarding whether he had any notes from interviews with Hawkins related to the bribe. The statements, though ambiguous, are not clearly contradictory. Brannigan initially stated that he knew that notes from interviews with Hawkins about a bribe existed, but he attempted to distinguish between knowing the notes existed and having access to them. Trial Tr. at 213. Brannigan later clarified that he had no access to notes regarding any interviews, stating that "I am almost certain I do not have any such notes. I would not have investigated that nor handled that." *Id.* at 216. The state trial court concluded that the first statement did not show that Brannigan had access to any notes about the bribery or that he knew about it.

The Illinois Supreme Court, in overturning Hawkins's conviction, stated that Hawkins "testified that he brought the fact of the bribe to the attention of the Cook County State's Attorney's and United States Attorney's offices in 1987." *Hawkins*, 181 Ill. 2d at 55, 690 N.E.2d at 1005. In Fergerson's case, the Illinois Appellate Court found that this statement was not contradictory to Brannigan's testimony at the evidentiary hearing that he knew that there was a bribery investigation involving Hawkins's case, but not any specifics. The court concluded that the prosecution in Fergerson's case did not know any specifics about Hawkins's involvement at the time. Resp. Ex. S at 8–9. The Court is required to presume the state appellate court's factual finding is correct. Furthermore, to the extent that Brannigan's testimony at the evidentiary hearing and Hawkins's testimony in his own case are in conflict, it would hardly be unreasonable for a state court to credit Brannigan's version over Hawkins's. Indeed, the very basis of Fergerson's petition is a contention that Hawkins lied.

The Court makes no independent judgment regarding Brannigan's credibility. That is not the issue here. Rather, the Court upholds the state court's finding in this regard because that finding is presumed correct, and Fergerson has not presented clear and convincing evidence to contradict it.

The state court also concluded that the prosecution at his trial did not know of any deal or understanding with Hawkins and therefore could not have suppressed such information. Fergerson has not presented clear and convincing evidence sufficient to rebut this finding. The state court found that Hawkins had appeared before a federal grand jury to testify about the El Rukns in April 1989 and pled guilty to federal offenses in October 1989. The court noted that nothing suggested that he had a deal with federal authorities in 1988, at the time of Fergerson's trial. Resp. Ex. M at 206, 208; Resp. Ex. O at 8. The court further noted that Hawkins's federal plea agreement expressly imposed no limits on state prosecutors in their ability to seek to uphold Hawkins's death sentence and allowed them to continue to seek the death penalty if his initial conviction were overturned. Resp. Ex. M at 91–92; Resp. Ex. O at 9. The court also noted that Brannigan had testified at both the trial and the evidentiary hearing that he offered Hawkins no deal in exchange for testimony. Resp. Ex. O at 10. At trial, Brannigan stated that "I emphatically told him I was not authorized to make any promises to him." Trial Tr. at 4776. At the evidentiary hearing, Brannigan confirmed that he had told Hawkins that "we would welcome cooperation, but we can't make any promises," although he acknowledged that Hawkins wanted to get off of death row. Resp. Ex. DD(26) at 165, 188. The state court also noted that Hawkins, in his grand jury testimony after the conclusion of the Fergerson trial, had stated that no law

17

enforcement agency had made him any promises with regard to his testimony or his cooperation in El Rukn investigations. Resp. Ex. M at 127.

Finally, the state trial court noted that state prosecutors had vigorously pursued the death penalty against Hawkins. The court noted that this made it unlikely that they had any implicit agreement to confer a benefit upon Hawkins in exchange for his testimony. After Hawkins's bribe of Maloney became public, the prosecution sought to uphold Hawkins's death sentence in an appeal to the Illinois Supreme Court, conceding that Hawkins had not received a fair trial but arguing that for equitable reasons he was not entitled to a new one. *Hawkins*, 181 Ill. 2d at 52, 690 N.E.2d at 1004. At the evidentiary hearing in Fergerson's case, a prosecutor who had worked on Hawkins's second trial stated that the prosecution continued to seek a death sentence for Hawkins after he was granted a new trial. Resp. Ex. DD(26) at 269. The plea agreement that Hawkins eventually received came after an evidentiary ruling by the state appellate court in his codefendant's favor, and it required only that Hawkins testify against his codefendant in that case. *Id.* at 273. The prosecutor stated that the plea agreement had nothing to do with Hawkins's testimony in Fergerson's case and that no federal or state law enforcement official asked the prosecution to give Hawkins consideration for any testimony or cooperation he had given. *Id.* at 272–73.

Fergerson contends that Hawkins's federal plea agreement, which is also signed by state prosecutors, demonstrates that there was an agreement at the time of Fergerson's trial in 1988. Resp. Ex. M at 93. The plea agreement is undated, but it references Hawkins's "testimony before the Special April 1987 Grand Jury." *Id.* at 88. Fergerson seems to contend that this means Hawkins's testimony before the grand jury

occurred in April 1987, before his trial. Contrary to Fergerson's assertion, however, the Special April 1987 Grand Jury did not hear testimony only in April 1987. Indeed, the only evidence in the record of Hawkins testifying before the Special April 1987 Grand Jury is a transcript dated April 27, 1989. *Id.* at 123. In that testimony, Hawkins stated that he had already testified against Fergerson in the Bibbs murder case. *Id.* at 175–76. In addition, Hawkins's federal plea agreement is signed by Cecil Partee in his capacity as Cook County State's Attorney. *Id.* at 93. Contemporaneous newspaper stories show that Partee did not become state's attorney until April 25, 1989. *See* Charles Mount & Thomas Hardy, *Partee starts as state's attorney amid doubts he can be elected*, Chicago Tribune, Apr. 26, 1989, at C8; Charles Mount, *County board picks Partee Republicans vow challenge*, Chicago Tribune, Apr. 25, 1989, at C1. Thus, the evidence demonstrates that Hawkins entered into the plea agreement at some point after he testified before the grand jury in April 1989. This was well after his testimony against Fergerson.

The Court also notes that the jury in Fergerson's case did hear evidence of the dealings between Brannigan and Hawkins that provided a motive for Hawkins to falsify his testimony. Testimony that was adduced at Fergerson's trial showed jurors that Hawkins hoped for a benefit through testifying and that he had not sought to testify until he was in trouble because of his death sentence. The fact that this evidence came in calls into serious doubt whether the additional evidence that Fergerson contends the prosecution did not disclose was material. *Carvajal*, 542 F.3d at 567 ("Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the

defense, the result of the proceeding would have been different." (internal quotation marks omitted)).

Hawkins admitted during his testimony at Fergerson's trial that he reached out to Brannigan by writing a letter after he received the death penalty and that he had not told police about the Bibbs murder even though he had previously been arrested for it. Trial Tr. at 4153–54, 4198–4200. Hawkins read his letter at Fergerson's trial, stating that it said, "I write you in hope that in the best interest of you and I can talk hoping you and I can come to some mutual understanding that benefit both of us." *Id.* at 4205. Brannigan admitted at the trial that he had received the letter from Hawkins and that he had gone to meet Hawkins in prison on account of the letter. *Id.* at 4775–76, 4784. Hawkins testified that he had many meetings with Brannigan. *Id.* at 4228.

Hawkins admitted before Fergerson's jury that he wrote in the letter that he wanted something, a "benefit." *Id.* at 4205–06. He was evasive when defense counsel asked him what exactly he wanted, but he conceded that he did not merely want to have a friendly conversation with Brannigan. *Id.* Hawkins testified that he would do almost anything to get off of death row. *Id.* at 4224. He refused to answer certain questions that he feared would harm his appeal. *Id.* at 4179–80. He acknowledged that if he won his death penalty appeal, he would likely be tried again, and that someone from the state's attorney's office would prosecute him. *Id.* at 4254–55. He also acknowledged that cooperating with the prosecution in Fergerson's case could help him, although he expressed skepticism that it could get him off of death row. *Id.* at 4289. Hawkins admitted that he had not been taken to court on the other double

homicide that he was implicated in since starting to cooperate with authorities, and he acknowledged that even with one death sentence, avoiding a second was desirable. *Id.* at 4193–96, 4287–88.

At Fergerson's trial, Hawkins refused to state unequivocally that he contacted Brannigan in hopes of getting help with his death sentence, stating only that he "wanted to talk to [Brannigan]." *Id.* at 4206. Hawkins claimed that he had not asked Brannigan for anything and had not been promised anything. *Id.* at 4232–34. As counsel for the various defendants repeatedly pointed out to the jury, however, no reasonable person could have thought that Hawkins suddenly began cooperating with police shortly after receiving a death sentence, after years of lying about his own role in Bibbs's murder and concealing the roles of his fellow El Rukns, for any reason other than wanting help in avoiding execution.

In short, the jurors had substantial evidence of Hawkins's motives for cooperating with the prosecution at all. It is highly questionable whether the evidence that Fergerson contends was concealed was material.

The Court concludes that Fergerson has not shown by clear and convincing evidence that the state court's finding that no impeachment information was suppressed was incorrect. The state court's conclusion that there was no *Brady* violation therefore was not based on an unreasonable determination of the facts. Nor did the decision unreasonably apply federal law.

**C.    Merits of the perjury claim**

Fergerson contends that the prosecution knowingly allowed Hawkins to give

perjured testimony, particularly when he testified that he had not been promised anything by prosecutors. Fergerson also argues that Hawkins gave perjured testimony when, after a prosecutor stated that the state "[c]an't kill you twice, can they?," Hawkins responded "[y]ou said it." *Id.* at 4274. Fergerson contends that Hawkins perjured himself by agreeing with this statement despite knowing that he was likely to have his death sentence reversed because it was imposed by Maloney after he returned the bribe. The context makes clear, however, that by making this statement, the prosecutor was attempting to counter allegations that Hawkins's second double homicide case had not been prosecuted because of his cooperation and was not simply suggesting that Hawkins was credible because he had nothing more to lose. *Id.* at 4274.

"A conviction obtained through the knowing use of false testimony violates due process." *Morales v. Johnson*, 659 F.3d 588, 606 (7th Cir. 2011). "To obtain a new trial, a petitioner must establish that: (1) there was false testimony; (2) the prosecution knew or should have known it was false; and (3) there is a likelihood that the false testimony affected the judgment of the jury." *Id.* Fergerson contends that Hawkins falsely testified that he did not have a deal with prosecutors. The state trial court, however, concluded that Hawkins did not have an agreement or understanding with prosecutors at the time of Fergerson's trial and therefore that Hawkins had not given false testimony. The court also found that prosecutors did not know of Hawkins's bribe of Maloney, and that they did not know about any false testimony Hawkins gave regarding the likelihood of his death sentence being overturned. It based its decision on the evidence discussed above in relation to the *Brady* claim, in particular the facts that state prosecutors had attempted to uphold Hawkins's death sentence and retry him

until long after Fergerson's trial and that one prosecutor testified that Hawkins's eventual plea agreement had nothing to do with the testimony that he provided at Fergerson's trial.  Resp. Ex. O at 14, 17–18.

The Court concludes that Fergerson has not presented clear and convincing evidence sufficient to rebut the presumption of correctness that applies to the state court's finding.  There is no evidence to indicate that Hawkins had any sort of agreement with prosecutors at the time of Fergerson's trial.  As with the *Brady* claim, Fergerson argues that Hawkins's federal plea agreement shows that he had an agreement with prosecutors at the time of Fergerson's trial.  Again, however, the evidence, including the fact that the state's attorney who signed the federal plea agreement was not appointed until April 1989, reflects that Hawkins entered into the agreement sometime well after Fergerson's 1988 trial.  Further, as the state court noted, the federal plea agreement expressly allowed state prosecutors to continue to pursue the death penalty for the double homicide for which Hawkins had been convicted.  Resp. Ex. M at 91–92.  Although state prosecutors agreed in Hawkins's federal plea agreement not to prosecute Hawkins for any other crimes for the time being, they reserved the right to prosecute him for other crimes, including other murders, if his sentence for the double homicide was ever reduced to less than life without parole.  *Id.*  In addition, the fact that state prosecutors had apparently stopped pursuing conviction of Hawkins for the other double homicide was revealed at Fergerson's trial.  Tr. Trans. at 4193–96.

Hawkins may have been lying at Fergerson's trial when he agreed with the prosecutor's statement that, because he had received a death sentence, prosecution

for any other crime did not matter to him.  *Id.* at 4274.  He conceivably may have understood even then that his death sentence ultimately would be overturned because of the Maloney episode.  The state appellate court concluded, however, that Brannigan and other state officials did not know that Hawkins had successfully bribed Maloney, even if they had some idea that Hawkins was cooperating in a bribery investigation.  Resp. Ex. S at 8–9.  This conclusion is consistent with Brannigan's statements before Fergerson's trial and at the evidentiary hearing.  Again, the Court makes no independent judgment regarding Brannigan's credibility.  The point is that Fergerson has not presented clear and convincing evidence to overcome the presumption of correctness that federal courts give to state court fact finding when deciding habeas petitions.  *Miller-El*, 545 U.S. at 240.  Because the evidence does not reflect that prosecutors knew that Hawkins was testifying falsely, the state trial court did not unreasonably apply federal law when it determined that the prosecution did not violate Fergerson's due process rights.

In addition, Hawkins testified at Fergerson's trial that state prosecutors had made no promises to him regarding retrial in the event that his appeal of his conviction was successful.  Tr. Trans. at 4274–75.  The state trial court found that this testimony was true on the basis of the state's continued attempts to prosecute Hawkins.  Fergerson has not presented clear and convincing evidence sufficient to overcome the presumption of correctness that applies to that finding.  Hawkins accurately informed the jury that even if he won his appeal, he would still be subject to retrial and had been given no promises regarding retrial.  Thus it is unlikely that any false testimony he gave (without the prosecution's knowledge) regarding the chance that his death sentence

24

would be overturned "affected the judgment of the jury."  *Morales*, 659 F.3d at 606.

In sum, the Court concludes that Fergerson has not presented clear and convincing evidence that the state courts' factual findings were incorrect.  Accordingly, the state court did not base its decision on an unreasonable determination of the facts and did not unreasonably apply federal law when it concluded that the prosecution did not violate Fergerson's due process rights.

## D.      Certificate of appealability

When a district court enters a final judgment adverse to a habeas corpus petitioner, it must issue or deny a certificate of appealability (COA).  Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.  To obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The petitioner must show "that reasonable jurists could debate whether (or . . . agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted).  When a district court denies a claim on procedural grounds, the petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id*.

Reasonable jurists could not debate that Fergerson's ineffective assistance claims are procedurally defaulted.  In addition, given the deferential standard of review applied to state court merits determinations and especially factual findings in a habeas

corpus proceeding, the issues the Court addressed on the merits are not close. The Court therefore declines to issue a certificate of appealability.

### Conclusion

For the reasons stated above, the Court denies Fergerson's habeas petition [docket no. 8] and declines to issue a certificate of appealability. The Clerk is directed to enter judgment in favor of the respondent.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  September 18, 2012